902 F.2d 293
 58 USLW 2711
 LEAGUE OF UNITED LATIN AMERICAN CITIZENS COUNCIL NO. 4434,
Plaintiffs-Appellees,
and
Jesse Oliver, et al., Intervening Plaintiffs-Appellees,
v.
William P. CLEMENTS, etc., et al., Defendants.
Jim MATTOX, et al., Defendants-Appellees, Appellants,
v.
Judge F. Harold ENTZ, etc., Judge Sharolyn Wood, etc., and
George S. Bayoud, Jr., etc., Defendants-Appellants,
and
Tom Rickhoff, Susan D. Reed, John J. Specia, Jr., Sid L.
Harle, Sharon Macrae and Michael P. Pedan, Bexar
County, Texas State District Judges, Appellants.
 Nos. 89-8095, 90-8014.
 United States Court of Appeals,
Fifth Circuit.
 May 11, 1990.
Rehearing En Banc Granted May 16, 1990.*
 
 David C. Godbey, Jr., Robert H. Mow, Jr., Hughes & Luce, Dallas, Tex., for Judge Entz.
 J. Eugene Clements, Evelyn V. Keyes, Porter & Clements, Houston, Tex., for Judge Wood.
 John L. Hill, Jr., Andy Taylor, Liddell, Sapp, Zivley, Hill & Laboon, Houston, Tex., for Bayoud.
 Mark H. Dettman, Midland, Tex., for Dist. Judges of Travis County.
 Gerald H. Goldstein, Goldstein, Goldstein & Hilley, Seagal V. Wheatley, Donald R. Philbin, Jr., Oppenheimer, Rosenberg, Kelleher & Wheatley, Joel H. Pullen, Kaufman, Becker, Pullen & Reibach, San Antonio, Michael E. Tigar, Austin, Royal B. Lea, III, San Antonio, Tex., for Tom Rickhoff, et al.
 R. James George, Mr. John M. Harmon, Mrs. Margaret H. Taylor, Graves, Dougherty, Hearon & Moody, Austin, Tex., for Chapman and Stovall.
 Walter L. Irvin, Dallas, Tex., for amicus curiae Brashear, et al.
 Mark Gross, Atty. Gen., U.S. Dept. of Justice, Civ. Div., Washington, D.C., for amicus curiae U.S.
 Orlando Garcia, San Antonio, Tex., Bertha Alicia Mejia, Larry Evans, Houston, Jose Garza, Judith Sanders Castro, Mexican American Legal, Defense Educational Fund, San Antonio, Tex., for amicus curiae Mexican American Legislative Caucus.
 Tom Maness, Dist. Atty., Tom Rugg, Asst. Dist. Atty., Beaumont, Tex., for Jefferson County.
 William L. Garrett, Garrett, Thompson & Chang, Dallas, Tex., for Lulac, et al.
 Rolando L. Rios, Susan Finkelstein, San Antonio, Tex., for League of United Latin Citizens.
 Gabrielle K. McDonald, Matthews & Branscomb, Austin, Tex., for Legislative Black Caucus, et al.
 Renea Hicks, Javier Guajardo, Sp. Asst. Attys. Gen., Austin, Tex., for Jim Mattox, et al.
 Edward B. Cloutman, II, Mullinax, Wells, Baab & Cloutman, E. Brice Cunningham, Dallas, Tex., for Jesse Oliver, et al.
 Sherrilyn A. Ifill, NAACP Legal Defense and Education Fund, Inc., New York City, for Houston Lawyers Ass'n.
 Michael Ramsey, Ramsey & Tyson, Houston, Tex., for amicus curiae 27 Incumbent Judges.
 Paul Strohl, Daniel M. Ogden, Dallas, Tex., Daniel J. Popeo, Paul D. Kamenar, Alan M. Slobodin, Washington, D.C., for amicus curiae Washington Legal Foundation.
 Appeals From the United States District Court for the Western District of Texas.
 Before KING, JOHNSON and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 This is a voting rights suit challenging the election of district judges on a county-wide basis in Texas. The suit was filed in a United States District Court by the League of United Latin American Citizens against the Attorney General of Texas, the Secretary of State, and other state officials, seeking a declaratory judgment that the at-large election of state district judges in nine targeted counties is illegal under Sec. 2, 42 U.S.C. Sec. 1973, and violative of the fourteenth and fifteenth amendments of the United States Constitution. Plaintiffs requested the district court to enjoin further elections and to impose a districting scheme that included single-member districts. Texas has 254 counties, but the suit attacked only Harris, Dallas, Tarrant, Bexar, Travis, Jefferson, Lubbock, Hector, and Midland Counties.[1] These nine counties have more than one district judge elected county-wide, and elect 172 of the state's 390 district judges. As we will explain, the suit targets Texas law requiring election of a state district judge from a district no smaller than the county, the geographical area of its jurisdiction.
 
 
 2
 After a bench trial, the district court found violations of the Voting Rights Act in each of the nine counties, but rejected the constitutional arguments, finding that plaintiffs had failed to prove that the electoral system was instituted or maintained with discriminatory intent. On January 2, 1990, the district court enjoined defendants from:
 
 
 3
 Calling, holding, supervising and certifying elections for state district judges in Harris, Dallas, Tarrant, Bexar, Travis, Jefferson, Lubbock, Hector and Midland Counties under the current at-large system with an order for interim relief.
 
 
 4
 The district court divided the nine counties into electoral subdistricts, tracing the districts of state representatives and the precinct lines of County Commissioners or Justices of the Peace. The district court's order affected 115 of the 172 district courts. The district court also ordered a non-partisan election for May 5, 1990, with any run-off to be held on June 2, 1990. We stayed the district court's order pending this appeal.
 
 
 5
 Defendants first argue that the Voting Rights Act as amended in 1982 has no application to the election of judges. This argument rests on the assertion that the use by Congress of the word "representatives" in section 2(b), added by amendment in 1982 and popularly known as the Dole compromise, unambiguously excluded elected judges because elected judges are not representatives. This argument in its broadest form--section 2(b) of the Act has no application to any judicial elections--was rejected by this court in Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, --- U.S. ----, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). Relatedly, but with less sweep, defendants argue that section 2(b) has no application to state district judges because such judges do their judging singly and not as part of a collegial body. Finally, defendants attack the findings below as well as the ordered remedy. In addition to quarrels with the sufficiency of proof that the votes of minorities were diluted, defendants argue that the findings are flawed by the erroneous legal conclusion that the contribution of partisan voting to election outcomes is not relevant.
 
 
 6
 This panel is, of course, bound by the earlier panel decision in Chisom. Nonetheless, we discuss at some length its holding that Section 2 applies to judicial elections because it is relevant to the issue we do decide with respect to trial judges and because we are persuaded that Chisom 's decision regarding the election of appellate judges was correct. We reject the argument that we should extend Chisom. We hold that the at-large election of trial judges does not violate Section 2(b) of the Voting Rights Act. Because we decide the case on this ground we do not reach defendants' other contentions.
 
 
 7
 * It is vigorously argued that section 2 of the Voting Rights Act has no application to judicial elections because judges are not representatives. The argument in its strongest form is that the word "representatives," found in section 2(b), unambiguously excludes judges because judges have no constituents. The argument continues that there is no occasion for exploring legislative history because the inquiry ends with the plain words of the statute. It is conceded that the language of section 2(b) is largely drawn from White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), except that it substituted the word "representatives" for "legislators," at the least to insure it reached elected executive officials. Defendants argue that although "representatives" may encompass executive officials, the term does not encompass judges. It is implicit that to be unambiguously inapplicable to judges, the word must be certain of only one relevant meaning and that meaning must exclude judges. That is, the relevant difference between elected judges and other representatives must be universally plain. Defendants must concede, however, that at one level of generality judges are representatives. The history of electing judges and the political impulses behind that choice are powerful evidence of considered decisions to keep judges sensitive to the concerns of the people and responsive to their changing will, an endeavor hardly antithetical to common law courts. As we will explain, this reality belies the bold assertion that judges are in no sense representatives.
 
 
 8
 While the Framers of the Constitution might not have viewed appointed judges as "representatives" like legislators or executive officials, we are pointed to no evidence of the Framers views on the status of elected judges, an unfamiliar phenomenon. This is not surprising. Judges were not elected at the time the Constitution was written and ratified. The thirteen original states employed various methods of judicial selection, seven using appointment by the legislature, five by governor and council, and one by governor and legislature. See Winters, Selection of Judges--an Historical Introduction, 44 Tex.L.Rev. 1081, 1082 (1966). Texas became the first new state to adopt the federal method of selecting judges, by executive appointment with confirmation by the state senate. It did so when it joined the United States in 1845. Id.; Tex. Const. art. IV., Sec. 5 (1845). Electing judges was a reform measure aimed at making judicial selection more democratic.
 
 
 9
 Popular sovereignty and popular control of public affairs through the elective system were hallmarks of the Jacksonian era, and, not surprisingly, the movement for popular election of judges dates from this period. Dissatisfaction with the judiciary was widespread among Jacksonians. It arose from several factors including a general disaffection with the legal profession, abuses in the judicial appointment systems, and a feeling, carried over from the Jeffersonian period, that the courts were basically undemocratic. Consequently, the abolition of tenure during good behavior and the adoption of the elective system were advocated as reform measures and were hailed as in accord with the egalitarian spirit of the times.
 
 
 10
 Note, The Equal Population Principle: Does It Apply to Elected Judges?, 47 Notre Dame L.Rev. 316, 317 (1971).
 
 
 11
 The experimentation with self-governance and the concept of sovereignty in the populace as a whole thus spread to the judiciary. The first judicial elections took place as early as 1812 for Georgia lower court judges, Ga. Const. art. III, Sec. 4 (1812), and in 1832 Mississippi adopted a completely elective judiciary. Miss. Const. art. IV, Secs. 2, 11, 16 (1832). The change from appointed to elected judges can be marked by New York's adoption of judicial elections in 1846. N.Y. Const. art. VI, Secs. 2, 4, 12, 14 (1846). All new states entering the union after that date, until the entrance of Alaska in 1958, used elections as their method of judicial selection, and Georgia, Maryland, Virginia, and Pennsylvania switched from appointment to election. Winters, Selection of Judges, 44 Tex.L.Rev. at 1082. In short, it is fair to conclude that electing judges was viewed as being more democratic and as a way of ensuring that judges remained sensitive to the concerns of the people.
 
 
 12
 It is contended that judges are oath bound to obey the law and fairly decide in an impartial manner, and thus are not representatives. Yet, executive officials, who are considered representatives, are bound by the same oath. While judges are indeed far removed from the logrolling give and take of the legislative and even executive processes, the effort to assure "sensitivity" and "accountability" through elections is no more than an insistence that the judges represent the people in their task of deciding cases and expounding the law. State judges, wearing their common law hats, face decisions such as whether to adopt a comparative fault standard, and in doing so represent the people in a very real sense. At least at this level of generality judges are indisputably representatives of voters. Saying so in no way steps on the equally indisputable difference between judges and other representatives--that judges do not represent a specific constituency.
 
 
 13
 In arguing that Congress could not have meant to include judicial elections within the scope of Section 2, the defendants point to the specter of single-member districts for judges whose geographical jurisdiction exceeds the electing district. This in terrorem vision of judges biased in favor of a small portion of the people over whom they have jurisdiction puts representation at it lowest and most troubling level. It is flawed, however, because it rests in turn on the assumption that such judges as single officials, as distinguished from members of collegial bodies, are subject to the restraints imposed by Sec. 2(b) of the Act upon at-large elections, a proposition we otherwise here reject.
 
 
 14
 If we are correct in rejecting the assertion that the application of Section 2 of the Voting Rights Act is not answered by the word "representative," we must turn to legislative history, cautious as we must be over that enterprise. Then, in the absence of plain signals of legislative purpose, the outcome must turn on the question we ask. Should we ask whether we are persuaded that Congress did not intend to withdraw coverage, or should we ask whether Congress intended to extend coverage? The choice between the two possible questions is important. This choice is informed, if not controlled, by whether the Voting Rights Act before the 1982 Amendments covered judicial elections. If the answer is that the Act plainly did cover judicial elections before the 1982 amendments, we then turn to whether the amendments require the exclusion of judicial elections from the Act's coverage. It is suggested that the results test of Section 2(b) represented a fundamental shift in the operation of the Act, that is, that adopting section 2(b) was not a question of retrenchment or expansion of existing coverage but was, rather, an entirely new direction. As such, section 2(b) should not be read to reach judicial elections unless Congress explicitly said so. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).
 
 
 15
 We turn first to whether the Voting Rights Act covered judicial elections before 1982. We then consider the 1982 amendments to the Act, and review the legislative history of the amendments to determine whether Congress intended to exclude judicial elections from coverage under the Act. Given some evidence that Congress intended to cover judicial elections, we turn to the question of whether Congress was required to specifically mention the election of judges in the statute. After determining that the election of state appellate judges has no claim to the protections of federalism not shared by other institutions of state government, we look at the interplay of sections 2 and 5 to determine whether differences between the two sections preclude the application of section 2 to judicial elections despite section 5's coverage of those same elections.
 
 
 16
 * Section 2, before the 1982 amendments, provided:
 
 
 17
 Sec. 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites.
 
 
 18
 No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.
 
 
 19
 42 U.S.C. Sec. 1973 (1975).
 
 
 20
 Section 2 by its express terms reaches state judicial elections. "Vote" or "voting" was defined as including "all action necessary to make a vote effective in any primary, special or general election ... with respect to candidates for public or party office and propositions for which votes are received in an election." 42 U.S.C. Sec. 1973l (c)(1). It is true that there is no mention of judges or the judiciary. There also is no mention of any other specific office. Judges are "candidates for public or party office" elected in a "primary, special, or general election." There is further evidence of congressional intent to reach all types of elections, rather than to pick and choose for regulation only some from the myriad of state elections, in the fact that votes on propositions are within the purview of the Act. Section 14(c)(1), 42 U.S.C. Sec. 1973l (c)(1).
 
 
 21
 Defendants argue that the Act is silent as to judges, so it must be construed as not including judicial elections. They argue that, while judges in Texas are "candidates for public office," it is uncertain whether Congress, by providing a broad definition of "vote," also intended to create a private remedial cause of action of similar scope in Section 2. Congress expressly defined the term "vote" or "voting," however, and nothing suggests that Congress did not intend that definition to apply throughout the Act, including Section 2.
 
 
 22
 Congress intended that its 1965 Act provide protection coextensive with the Constitution. Justice Stewart reiterated this in Mobile v. Bolden:
 
 
 23
 [I]t is apparent that the language of section 2 no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of section 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself....
 
 
 24
 446 U.S. 55, 60-61, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980). We reject the implicit suggestion that the protections of the Fifteenth Amendment do not extend to minorities whose right to vote in judicial elections is abridged. The Fifteenth Amendment applies to all elections, and Congress intended the Voting Rights Act of 1965 to apply to all elections. We would not lightly conclude that the 1965 Act would allow a state to have judicial elections separate from other elections and impose literacy tests, poll taxes, or other restrictions on voting just because the elections were for judges.
 
 
 25
 By its terms, then, the 1965 Act included judicial elections. The question remains whether the 1982 amendments exempted judicial election from the Act's coverage.
 
 B
 
 26
 Congress amended Section 2 in 1982 in partial response to the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Thornburgh v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). Bolden held that in order to establish a violation under Section 2 of the Act a plaintiff must prove purposeful racial discrimination. Bolden, 446 U.S. at 66, 100 S.Ct. at 1499. Congress incorporated a "results test" into Section 2(a) to diminish the burden of proof necessary to prove a violation. Congress also created an entirely new subsection, Section 2(b), which codified the legal standards enunciated in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).[2] As amended in 1982, Section 2 now provides:
 
 
 27
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 28
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 29
 42 U.S.C. Sec. 1973 (1982).
 
 
 30
 The plain language of Section 2(a) reaches judicial elections, using the same language as the 1965 Act, referring generally to "voting" and "vote," definitions continued unchanged under the 1982 amendments. The legislative history of the 1982 amendments does not indicate that the terms "vote" or "voting" do not include judicial elections, or that "candidates for public office" does not include judges.
 
 
 31
 Section 2(b) is a new section added in the 1982 amendments. Section 2(a) refers to "denial or abridgement of the right ... to vote on account of race or color ..., as provided in subsection (b) of this section." Section 2(a) anticipates that subsection (b) will define how a violation of subsection (a) can be established. There is no reason to suppose that subsection (b) defining the type of proof necessary under Section 2 was meant to exclude judges, except for its use of the term "representatives." As previously noted, this word does not unambiguously exclude judges, for although the office is certainly not representative in every sense, elected judges nonetheless reflect the views of the electors choosing them to be responsible for administering the law. We therefore turn to the legislative history of the 1982 amendments to determine whether Congress intended to exclude judicial elections from coverage.
 
 
 32
 That Congress did not intend to exclude judges is indicated by the use of the word "candidates" interchangeably with "representatives" in the legislative history. Even Senator Dole, who proposed section 2(b), stated:
 
 
 33
 Citizens of all races are entitled to have an equal chance of electing candidates of their choice, but if they are fairly afforded that opportunity, and lose, the law should offer no redress.
 
 
 34
 S.Rep. No. 417, 97th Cong., 2d Sess. 193 (Additional Views of Senator Robert Dole), reprinted in 1982 U.S.Code Cong. & Admin.News 177, 364 (emphasis added), and
 
 
 35
 [T]he standard is whether the political processes are equally "open" in that members of a protected class have the same opportunity as others to participate in the political process and to elect candidates of their choice.
 
 
 36
 Id. (emphasis added).
 
 
 37
 In the one place where the judiciary is specifically mentioned in the legislative history of the 1982 amendments, the report of the subcommittee on the Constitution states that the term " 'political subdivision' encompasses all governmental units, including city and county councils, school boards, judicial districts, utility districts, as well as state legislatures." Report of the Subcommittee on the Constitution of the Committee of the Judiciary, S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News 177, 323 (emphasis added). Of course, a brief statement in a subcommittee report not in favor of the amendments is not a definitive description of the scope of the Act, but no other comments on the judiciary were made. The proponents of the changes to the Act did not contest this description, although they would have had incentive to do so to alleviate any fears of such extended coverage if such a broad scope of applicability were not intended.
 
 
 38
 The Senate and House hearings regarding the 1982 amendments contain various references to judicial elections, primarily in the context of statistics presented to Congress indicating the progress made by minorities under the Act up to that date. The charts indicated when minorities were elected to office, and included judicial election results. See Extension of the Voting Rights Act: Hearings on H.R. 1407, H.R. 1731, H.R. 3112, H.R. 3198, H.R. 3473 and H.R. 3498 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 97th Cong. 1st Sess. 38, 193, 239, 280, 502, 574, 804, 937, 1182, 1188, 1515, 1528, 1535, 1745, 1839, 2647 (1981); Voting Rights Act: Hearings on S. 53, S. 1761, S. 1975, S. 1992, and H.R. 3112 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 97th Cong.2d Sess. 669, 748, 788-89 (1982). Statistics on judicial elections were considered by Congress in amending the Act, and there is no indication that Congress meant to exclude these elections from coverage.
 
 
 39
 Some of the legislative history of the 1982 amendments indicates that Congress intended to return to pre-Bolden standards, and did not think that it was creating a new and much more intrusive private cause of action.[3] As we will explain, at least Senator Hatch feared the language of Sec. 2(b) would be much more intrusive, expressing concern that its uncertainty would lead to proportional representation.
 
 
 40
 The principal focus of the House debates centered on Section 5, but the Senate debates were centered on the meaning of the section 2 amendments. Nonetheless, there was some discussion in the House, and at least some witnesses argued that "the amended section 2 ... would restore to black Southerners the right to challenge alleged discriminatory election schemes which were developing before Mobile, [and that] notwithstanding the Court's claim to the contrary in Mobile, the intent test first became a constitutional standard in 1976 with Washington v. Davis, an employment case." Boyd & Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347, 1366 (citing comments by James Blacksher and David Walbert). Congressman Sensenbrenner argued that the Rodino amendment to section 2 was necessary in order to clarify the standard of proof required in order to establish violations of the Act. 127 Cong.Rec. H6850 (daily ed. Oct. 1981) at H6983.
 
 
 41
 In the Senate Report on the Amendments the purpose of the bill was stated as
 
 
 42
 designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. It thereby restores the legal standards based upon the controlling Supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved in Mobile v. Bolden. The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-Bolden vote dilution case, White v. Regester.
 
 
 43
 S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at 179 (emphasis added).
 
 
 44
 Senator Hatch opposed the change, arguing that it "would redefine the concept of 'discrimination' and would 'transform the Fifteenth Amendment and the Voting Rights Act from provisions designed to ensure equal access and equal opportunity in the electoral process to those designed to ensure equal outcome and equal success.' " Boyd, Voting Rights Act Amendments, 40 Wash. & Lee L.Rev. at 1389 (quoting Hearings on the Voting Rights Act Before the Senate Subcommittee on the Constitution of the Committee on the Judiciary, 97th Cong., 2d Sess. 3 (1982)). But, Senator Mathias, a proponent of the bill, argued:
 
 
 45
 The House amendment is needed to clarify the burden of proof in voting discrimination cases and to remove the uncertainty caused by the failure of the Supreme Court to articulate a clear standard in the City of Mobile v. Bolden.... We are not trying to overrule the Court. The Court seems to be in some error about what the legislative intent was.... Prior to Bolden, a violation in voting discrimination cases [could] be shown by reference to a variety of factors that, when taken together, added up to a finding of illegal discrimination. But in Bolden, the plurality appears to have abandoned this totality of circumstances approach and to have replaced it with a requirement of specific evidence of intent ... this is a requirement of a smoking gun, and I think it becomes a crippling blow to the overall effectiveness of the Act.
 
 
 46
 Hearings on the Voting Rights Act Before the Senate Subcommittee on the Constitution of the Committee on the Judiciary, 97th Cong., 2d Sess. 3, 199 (1982).
 
 
 47
 Senator Hatch persisted that the results test represented a new test, but supporters of the bill took issue with this view. Laughlin McDonald of the ACLU argued that "Prior to Mobile, it was understood by lawyers trying these cases and by the judges who were hearing them that a violation of voting rights could be made out upon proof of a bad purpose or effect ... Mobile had a dramatic effect on our cases." Id. at 369. Defenders of the amendment assumed that the results test represented a restatement of the law prior to Mobile.
 
 
 48
 Critics of the results test argued that even if the lower federal courts had adopted a results test in their pre-Mobile interpretation of section 2, the original intent of Congress had been the establishment of a test in section 2 using the traditional standard of intent or purpose. Boyd, Voting Rights Act Amendments, 40 Wash. & Lee L.Rev. at 1405 (citing Appendix to Additional Views by Senator Hatch, S.Rep. No. 417, 97th Cong., 2d Sess. 36 (1982)). Proponents responded by arguing that there was no evidence that Congress meant an intent test to apply. The Senate Report of the Committee on the Judiciary adopted this view, citing Attorney General Katzenbach's testimony during the hearings on the Voting Rights Act of 1965 to the effect that "section 2 would ban 'any kind of practice ... if its purpose or effect was to deny or abridge the right to vote on account of race or color." S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at 194 (citing Hearings on S. 1564 before the Committee on the Judiciary, 89th Cong., 1st Sess., 191 (1965)).
 
 
 49
 Again, while this legislative history generally indicates an intent to return to pre-Bolden standards rather than create a more intrusive new cause of action, it is not conclusive. Particularly when the 1982 amendments are considered in light of the Supreme Court's interpretation in Gingles, we cannot conclude that the 1982 amendments to section 2 worked no fundamental changes from the pre-Bolden interpretation of the Act.
 
 
 50
 Few would quarrel with the assertion that Section 2(b) as interpreted has worked a fundamental change in the Act, highly intrusive to the states. We have insisted in other contexts that Congress clearly state its intent to supplant traditional state prerogatives. Judicial insistence upon clear statement is an important interpretative tool vindicating concern for separation of powers and federalism. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II ). This insistence upon "an unequivocal expression of congressional intent," Pennhurst II, 465 U.S. at 99, 104 S.Ct. at 907, is based upon the fundamental nature of the interests at stake. "The 'constitutionally mandated balance of power' between the states and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.' " Atascadero, 105 S.Ct. at 3147 (quoting Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 572, 105 S.Ct. 1005, 1028, 83 L.Ed.2d 1016 (1985) (Powell, J., dissenting)). These mighty principles do not carry us very far here. Congress has clearly expressed the Act's application to the states, and has clearly expressed its intent that violations of the Act be determined by a results test rather than an intent standard. By these actions, the Act, with all of its intrusive effect, has been made to apply to the states. The federalism concerns underlying insistence upon an explicit statement that state judicial elections were included in the Act's coverage rest upon the premise that the Act's application, profoundly intrusive as it is, is somehow uniquely intrusive in its limits upon an elected state appellate judiciary. This contention is by necessity a demand for the exemption of judicial elections from the entire act. But, Section 5, commonly seen as the most far reaching of the Voting Act provisions, see South Carolina v. Katzenbach, 383 U.S. 301, 358-62, 86 S.Ct. 803, 833-35, 15 L.Ed.2d 769 (1966) (Black, J., dissenting), has allowed no escape for elected state judiciaries. Haith v. Martin, 618 F.Supp. 410 (E.D.N.C.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). As an inferior court we are bound by the holding of the Supreme Court that judicial elections are covered by Sec. 5 of the Act, a result explicitly urged by then Solicitor General Charles Fried and the then head of the Civil Rights Division, Assistant Attorney General William Bradford Reynolds. The same officials argued in Chisom that Sec. 2(b) of the Act is equally applicable.
 
 C
 
 51
 Indeed, we are asked to hold that section 2 could not apply to judicial elections while section 5 does apply, although it also makes no express reference to judges. In Haith the district court held that judicial elections are covered by section 5 and the preclearance requirements of the Act. The district court found, using an analysis similar to that used by this circuit in Voter Information Project v. Baton Rouge, 612 F.2d 208 (5th Cir.1980), that although the one-person, one-vote principle may not apply to judicial elections, claims with respect to the Voting Rights Act do not deal with numerical apportionment, but with discrimination.[4] The court held that "the Act applies to all voting without any limitation as to who, or what, is the object of the vote." 618 F.Supp. at 413.[5]
 
 
 52
 The defendants have not raised any compelling reason to distinguish between Section 5 and Section 2 with respect to their applicability to judicial elections, at least as to judges who act collegially. To hold otherwise would lead to the incongruous result that if a jurisdiction had a discriminatory voting procedure in place with respect to judicial elections it could not be challenged, but if the state sought to introduce that very procedure as a change from existing procedures, it would be subject to Section 5 preclearance and could not be implemented. Sections 2 and 5 operate in tandem, with Section 2 prohibiting the continued use of discriminatory practices, and Section 5 preventing the imposition of new discriminatory practices to replace those condemned in those areas subject to preclearance. Section 5 contains language defining its scope that is almost identical to the language in Section 2: "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...."
 
 
 53
 There are important differences in the two sections, however, for Section 5 applies only to changes the covered jurisdictions seek to implement. Section 5 requires preclearance of any new voting practices and procedures, and in determining whether or not a new practice is entitled to preclearance, only the effect of the new practice is considered. City of Lockhart v. United States, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983); Beer v. United States, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). This has been described as a retrogression test, with preclearance denied only if the new practice has a retrogressive effect, rather than a results test, for the effects of the existing system on minorities are not considered. The real difference is that in section 2 the entire scheme of voting practices and procedures is considered to see whether it results in less than an equal opportunity to participate in the political process, whereas under section 5 only the effects of new practices and procedures are considered. Section 2 is, therefore, arguably more intrusive than section 5,[6] for section 5 only regulates whether or not changes may be implemented, whereas section 2, if a violation is found, can lead to the dismantling of an entire system of voting practices that may have been in place for many years. This is a distinction between the two sections, but our question must be whether the difference means that section 5 applies to judicial elections, but section 2 does not. There appears to be no relevant reason why judicial elections, the representative character of appellate judges aside, are so different from legislative or executive elections that both sections should apply to one and not the other.
 
 D
 
 54
 It is difficult to conclude that the Voting Rights Act did not cover judicial elections before the 1982 amendments. It is equally plain that there is little evidence that any retrenchment was intended by the 1982 amendments. In sum, defendants are left with the unconvincing argument that the fundamental changes of the 1982 amendments were fundamental in ways unique to judicial elections. The argument has force, but only if the application of the Act were to require single-member districting for single judge seats. Otherwise, although considerably intrusive in general, section 2(b) is no more specifically intrusive in judicial elections than in any others. We hold that Section 2 of the Voting Rights Act applies to judicial elections.
 
 II
 
 55
 We turn now to the contention that we must not:
 
 
 56
 take the concept of a class's impaired opportunity for equal representation and uncritically transfer it from the context of elections for multi-member bodies to that of elections for single-member offices.... [T]here is no such thing as a "share" of a single-member office.
 
 
 57
 Butts v. City of New York, 779 F.2d 141, 148 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). District courts in Texas consist of individual judges who decide their cases alone. They do not exercise their power together as parts of a multi-member body, and there can be no share of the authority vested in each judge.
 
 
 58
 * The district courts are the primary trial courts in Texas. See Tex. Const. Art. 5, Section 8 (1876, amended 1985). Indeed, the constitution of the Republic of Texas provided:
 
 
 59
 The Republic of Texas shall be divided into convenient judicial districts, not less than three, nor more than eight. There shall be appointed for each district a judge, who shall reside in the same, and hold the courts at such times and places as Congress may by law direct.
 
 
 60
 Guittard, Court Reform, Texas Style, 21 Sw.L.J. 451, 456 (1967). The first state constitution, adopted in 1845, contained essentially the same provision in article IV, section 6. This provision was amended in 1850 to allow for the election of district judges by the people, but the subsequent constitution of 1861 provided that district judges were to be appointed. Tex. Const. art. V, Sec. 7, interpretive commentary (1876, amended 1985). Texas constitutions adopted since 1861, including the current constitution, which was adopted in 1876, have provided for elected district judges.
 
 
 61
 All the constitutions have provided that the district courts are to be held by district judges chosen from defined districts, following the pattern of the Constitution of the Republic of Texas. Although in the Constitution of the Republic of Texas the number of district courts was limited to not more than eight, subsequent constitutions have left the number of courts to the legislature. All the Texas constitutions, including the current one, before it was amended in 1985, suggested that each district would be served by only one judge. See Tex. Const. art. V, Sec. 7 (1986, amended 1985) ("[f]or each district there shall be elected ... a Judge...."). A one judge per district system, however, presupposes districts of substantially equal population. Guittard, supra at 456. Thus, with the growth of the population in certain counties it became necessary for the legislature to make adjustments.
 
 
 62
 The system challenged in this case was set up according to this pattern. See Tex. Gov't Code Secs. 24.001-24.954 (Vernon 1988 & Supp.1990). With the exception of the 72nd district, each challenged judicial district in the nine targeted counties is coextensive with one county. The 72nd district is composed of two counties. Id. Sec. 24.174 (Vernon 1988). Since 1907 district judges have been elected county-wide. In 1985, however, a section was added to article V of the 1876 Constitution which specifically allows the creation of judicial districts smaller than a county. Tex. Const. art. V, Sec. 7a(i) (1985). A majority of the voters in the county must authorize the division. Id. This power has yet to be exercised.[7]
 
 
 63
 The district courts in multi-district counties were unified for certain administrative purposes in 1939 through the passage of the Special Practice Act, which is now, for the most part, found in Tex.R.Civ.P. 330(e)-(i). Guittard, supra at 457-58. The relevant parts of the Special Practice Act essentially provide that cases can be freely transferred between judges and that any judge can work on any part of a case including preliminary matters. Also, "[a]ny judgment rendered or action taken by any judge in any of said courts in the county shall be valid and binding." Tex.R.Civ.P. 330(h).
 
 
 64
 The Administrative Judicial Act, originally passed in 1927 and subsequently amended on several occasions, divides Texas into nine administrative regions, each with a presiding judge appointed by the governor with the advice and consent of the senate. See Tex.Gov't Code Secs. 74.005, 74.042 (Vernon 1988). The "presiding administrative judge is the key administrative officer in the Texas judicial system." Guittard, supra at 459.[8] He is empowered to assign judges as necessary within his region. Id. Secs. 74.052-74.056 (Vernon 1988 & Supp.1990); see also Judicial Administration Rule 8 (Vernon 1988 & Supp.1990). He is required to call two meetings of all judges in his administrative region each year and any other meetings as necessary. Tex.Gov't Code Sec. 74.048(a) (Vernon 1988); Judicial Administration Rule 4 (Vernon 1988 & Supp.1990). This conference is for "consultation and counseling concerning the state of the civil and criminal business" and is empowered to promulgate administrative rules, rules governing the order of trials and county-wide recordkeeping, and other rules deemed necessary. Tex.Gov't Code Sec. 74.048(b), (c) (Vernon 1988).
 
 
 65
 The local administrative judge is elected by a majority vote of all the judges in the county, including both district and statutory judges. Id. Sec. 74.091 (Vernon 1988 & Supp.1990). His duties on the county level are similar to those of the presiding administrative judge. See id. Sec. 74.092. The local administrative judge has the power to assign judges within his county. Id. Sec. 74.094. Under the leadership of the local administrative judge, the district and statutory judges in each county are directed to adopt local rules of administration. Id. Sec. 74.093. These rules must provide for, among other things, the "assignment, docketing, transfer, and hearing of all cases" and "fair and equitable division of caseloads." Id. Sec. 74.094(b); see also Judicial Administration Rule 9(b) (Vernon 1988 & Supp.1990). All local rules, of course, must be consistent with state and regional rules. Judicial Administration Rule 10 (Vernon 1988). In this regard, Chief Justice Phillips testified that the only collegial decision-making by district judges in a county is in handling administrative matters.
 
 B
 
 66
 In Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986), the plaintiffs contested a primary run-off law, contending that it violated the Equal Protection Clause and the Voting Rights Act. The Second Circuit found that the law was not enacted with a discriminatory purpose, and that it also did not have the effect of denying an equal opportunity to participate in the political process. The court noted that one of the ways that a class of citizens may have less opportunity to participate is when there are electoral arrangements that diminish a class's opportunity to elect representatives in proportion to its numbers. The court distinguished, however, between multi-member bodies, where at-large elections may produce this result, and elections for single-member offices, stating:
 
 
 67
 There can be no equal opportunity for representation within an office filled by one person. Whereas, in an election to a multi-member body, a minority class has an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant, there is no such thing as a "share" of a single-member office.
 
 
 68
 Butts, 779 F.2d at 148. The court found that the Supreme Court had made this distinction implicit in City of Port Arthur v. United States, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982), where the Supreme Court struck down a run-off requirement for seats on a multi-member city council, but did not mention the run-off requirement for mayor. The Eleventh Circuit followed Butts in United States v. Dallas County, Ala., 850 F.2d 1430 (11th Cir.1988), in holding that "the at-large election of the probate judge is permissible under the Voting Rights Act with respect to the judicial aspects of that office." Id. at 1432 n. 1.
 
 
 69
 The positions at issue in Butts and Dallas County, and the position not considered in Port Arthur, were what can be viewed as traditional single member offices, i.e. mayor, city council president, single probate judge, or comptroller. There was only one of each office in a given geographical area, and no problem with overlapping jurisdictions. Here, there are many judges with overlapping jurisdictions. Nonetheless, each acts alone in wielding judicial power, and once cases are assigned there is no overlap in decision-making.
 
 
 70
 The special courts created within some judicial districts bolster the status of district courts as single-member offices, for not all of the judges handle the same type of work. Some are courts of general jurisdiction, but some judges are elected specifically to handle juvenile cases, or family law cases, or criminal cases. To that extent they are separate offices, just as county treasurer and sheriff are different positions. On the other hand, many of the judges handle the same type of cases and the cases are assigned to any of these judges within a given geographical jurisdiction. There are many of them within a geographical area, and the plaintiffs would find this dispositive. A United States district court in Alabama has held that Alabama district courts similar to the Texas courts are multi-member positions.[9] Southern Christian Leadership Conf. v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989). The court considered Dallas County and Butts, but concluded that:
 
 
 71
 Although neither court expressly defined the term "single-member office," it is clear to this court that the phrase, as used in those cases, refers to a situation where under no circumstances will there ever be more than one such position in a particular geographic voting area.
 
 
 72
 Siegelman, 714 F.Supp. at 518. The court did not accept the defendants' argument that
 
 
 73
 the hallmark of a single member office, as [the Butts and Dillard ] courts use the term, is not the fact that the office is traditionally held by only one individual but, more importantly, the fact that the full authority of that office is exercised exclusively by one individual.
 
 
 74
 Id. The court found that the coincidence of exclusive authority and exclusivity to a geographical area did not compel the view that exclusive authority meant single-member position. Id. The district court in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), also held that the at-large system of electing trial judges in Louisiana impermissibly diluted black voting strength, assuming that districts with more than one judicial position were multi-member districts. We disagree with this view of multi-member versus single-member office, and agree with the argument made in Siegelman, that "the hallmark of a single member office ... [is] the fact that the full authority of that office is exercised exclusively by one individual." 714 F.Supp. at 518.
 
 
 75
 The Eleventh Circuit grappled with determining whether a county commission chairperson held a single-member position in Dillard v. Crenshaw County, Ala., 831 F.2d 246 (11th Cir.1987), and looked to the functions performed by the official to make its decision. The chairperson would preside over commission meetings, but would have no vote except in the case of a tie, and his major function would be as county administrator. The County argued that this position was a single-member office that should be elected at large, and was not just another commissioner that would have to be elected from a single-member district like the other 5 commissioners. The Eleventh Circuit noted that:
 
 
 76
 As administrator, the chairperson is likened to sheriffs, probate judges, and tax collectors. For these positions, at-large, non-proportional elections are inherent to their nature as single-person officers elected by direct vote. [Butts ] Such single offices are most commonly limited to non-legislative functionaries. To the extent that the proposed chair position is not purely executive or judicial, Calhoun County further cites the examples of lieutenant governors and vice presidents. These, too, are single-office positions, and although the offices are executive, they include the authority to preside over legislative bodies and break tie votes.
 
 
 77
 Dillard, 831 F.2d at 251. These comments indicate that the Eleventh Circuit would find trial judges to be single member positions.[10] The court went on to find that the commission chairperson did not hold a single-member position because the position combined legislative and executive responsibilities. The nature of the position made "significant influence of the chairperson over legislative decision--even without a vote--inherent to the practice of the commission." Id. at 252. The district judges do not share in that type of decision making.
 
 
 78
 There is a conceptual problem with viewing district judges as members of a multi-member body. Before any suits are filed, before any cases are assigned, there is a group of judges with concurrent jurisdiction, and plaintiffs maintain that this group should have minority members, so that minorities' views and concerns are considered by the judges who decide important issues in their lives. The problem is that once a case is assigned, it is decided by only one judge. The other judges have absolutely no say over the disposition of that case, and no influence over the deciding judge. One commentator has described the Texas system as a "one-judge, one court organization at the trial level, with rigid jurisdictional lines and with each judge largely independent of any supervisory control, except by way of appellate review." Guittard, Court Reform Texas Style, 21 Sw.L.J. at 455.
 
 
 79
 These judges all hear and decide their own docket of cases, and their character as single-office holders instead of members of a multi-member body is emphasized by the problems inherent in attempting to create a remedy for lack of minority representation. For instance, the remedy in this case seems to lessen minority influence instead of increasing it, surely not what Congress intended when it enacted the Voting Rights Act or its amendments. The current system of electing district judges permits voters to vote for each and every judicial position within a given district, generally a county. Minority voters therefore have some influence on the election of each judge. Under the district court's order, each voter would have the opportunity to vote for only one judge in each district, the judge whose position was assigned to the subdivision. At the same time, a minority litigant will be assigned at random to appear before any district judge in the county. Under the district court's orders it is much more likely than not that a minority litigant will be assigned to appear before a judge who is not elected from a voting district with greater than 50% minority population. Instead, the great majority of district judges will be elected from new voting subdistricts with negligible minority populations and, consequently, negligible minority political influence on the outcome of those elections. Under the new order requiring election of judges from subdistricts, 9 of the 59 judicial positions in Harris county would be elected from minority dominated subdivisions. Minority voters would have very little influence over the election of the other 50 judges, for the minority population is concentrated in those 9 subdivisions. When minority members are litigants, however, they would not necessarily appear before one of the judges elected from a minority dominated subdivision. Instead, a minority member would have an 84.75% chance of appearing before a judge who has no direct political interest in being responsive to minority concerns.[11] The minority member would have a 98.3% chance of appearing before a judge in whose election he had not been able to vote. This is not like the situation in Chisom, where the judges were all part of one body, and every case that went to the Louisiana Supreme Court was heard by all of the judges, so every individual litigant from the state of Louisiana was assured that a judge for whom he had an opportunity to vote would hear his case.
 
 
 80
 Indisputably, district judges in Texas share administrative tasks with other district judges in the same county. Equally indisputably, however, the district judge in Texas does his judging alone. Judicial decisions at the trial court level are not the product of a collegial process. Whether section 2(b) of the Voting Rights Act reaches such officials can be turned on either of two approaches. One can view the single official doctrine as being no more than a statement of the mechanical impossibility of gaining greater representation for minorities. This approach is simply a resignation to the reality that if there is only one official, there can only be an at-large election. A second view is that the single official exception expresses far more. This view recognizes that where functions are singly exercised, providing single-member districts is no more than proportional representation in its most superficial form.
 
 
 81
 Some district courts have proceeded with the first view, concluding that the single official doctrine is inapplicable where more than one official was elected at-large by the same electorate. It is plain that this entire suit rests upon the premise that the single official exception reflects no more than the reality that there is nothing to divide unless there is more than one judge in a single county. It is no accident that this suit attacks only the nine counties with multiple district judges and minority populations. But, the right secured to minorities under section 2(b) of the Voting Rights Act to not have their vote diluted is expressed in the assertion that their interests are to be represented in governmental decisions. Where judges make their decisions alone, electing judges from single member districts only ensures that a small number of governmental decisions will be influenced by minority interests, while minority interests will not be represented at all in the majority of judicial decisions.
 
 
 82
 In embracing the single official concept, we express the judgment that the state's powerful interest in its structural arrangement of individual trial judges outweighs the potential amelioration of any dilution of minority interests achievable by subdistricting. This is particularly true here, where, as we have explained, the subdistricting remedy is at best problematic, and is likely perverse. The state's interests include avoiding the fact and appearance of biased decisionmaking, preserving the core attribute of the trial judge--unshared and non-delegable judgment. It does not follow that other rules attending the election of single officials, such as majority vote requirements, anti single-shot voting provisions, or numbered posts, may not be adjusted.
 
 
 83
 After careful consideration we conclude that Chisom was correctly decided, and Section 2 of the Voting Rights Act applies to judicial elections. There cannot be a violation of Section 2(b), however, through at-large elections of the trial judges who sit on the Texas district courts. While elected judges are representatives in that they are accountable to a constituency of electors, the full authority of a trial judge's office is exercised exclusively by one individual, and there can be no share of such a single-member office. Consequently, the county-wide election of district court judges does not violate the Voting Rights Act.
 
 
 84
 REVERSED.
 
 
 85
 JOHNSON, Circuit Judge, dissenting.
 
 
 86
 The majority's opinion essentially sets forth two premises. Initially, the majority concedes that it is bound by this Court's earlier decision in Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, --- U.S. ----, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). Chisom, which examined the application of Section 2 of the Voting Rights Act in the context of a challenge to Louisiana's system of electing state supreme court justices,[1] held that Section 2 applies with equal force to judicial elections. The panel in Chisom based this conclusion upon an examination of both the plain language and the legislative history of the Act. I applaud the reaffirmation of what I consider to be an inarguable and fundamental proposition.
 
 
 87
 I am, however, constrained to part company with the remainder of the majority opinion. The majority attempts to eviscerate the import of Chisom by whittling away at Chisom's language and reasoning so that the case is left standing for the tenuous proposition that Congress intended in Section 2 to prohibit the discriminatory dilution of minority voting strength when minorities are attempting to elect appellate court judges, but that Section 2(b) can never reach the at-large elections of trial judges--regardless of whether one or one hundred judges are elected from the same district--because the latter officials decide controversies independently. Succinctly, the majority, although "persuaded that Chisom's decision regarding the election of appellate judges was correct," has concluded that "the at-large election of trial judges does not violate Section 2(b) of the Voting Rights Act." Majority Opinion at 295. There is no support in the words of the Act itself, in Chisom, in the legislative history of Section 2, nor in logic for the majority's embrace of this result-oriented distinction. For the reasons stated herein, this dissent is respectfully submitted.
 
 
 88
 * This Court in Chisom made clear that the express language of Section 2 extends to any state election in which a candidate runs for public office, including judicial elections.[2] Texas district court judges are elected by popular vote, and, therefore, the language of the Voting Rights Act and the reasoning of Chisom require that minority groups not be systematically denied the opportunity to elect the judicial candidates of their choice. Yet despite this Court's previous determination that "[m]inorities may not be prevented from using section 2 in their efforts to combat racial discrimination in the election of state judges," Chisom, 839 F.2d at 1065, the majority now holds that no set of plaintiffs can be allowed to maintain a vote dilution claim under Section 2 of the Voting Rights Act if the challenged at-large elections target judges who do not operate on a "collegialbody" level.[3]
 
 
 89
 The majority, characterizing Texas district court judges as single office holders, concludes that no violation of Section 2(b) can be shown because "the full authority of a trial judge's office is exercised exclusively by one individual, and there can be no share of such a single-member office." Majority Opinion at 308. I am totally at odds with the majority's application of the so-called single office holder exception.
 
 
 90
 The majority relies primarily on the Second Circuit's opinion in Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), which dealt with New York's primary run-off election law. The contested New York law provides that if no candidate for mayor, city council president, or comptroller receives more than forty percent of the vote in a party primary, then a run-off between the two candidates receiving the most votes is held. The district court, concluding that the totality of the circumstances demonstrated a Section 2 violation, found for the plaintiffs. The Second Circuit reversed, noting that
 
 
 91
 so long as the winner of an election for a single-member office is chosen directly by the votes of all eligible voters, it is unlikely that electoral arrangements for such an election can deny a class an equal opportunity for representation.... The rule in elections for single-member offices has always been that the candidate with the most votes wins, and nothing in the Act alters this basic political principle.
 
 
 92
 Butts at 149. The Second Circuit also notes that
 
 
 93
 [t]he concept of a class's impaired opportunity for equal representation [cannot be] ... uncritically transfer[ed] from the context of elections for multi-member bodies to that of elections for single-member offices.... [T]here is no such thing as a "share" of a single-member office.
 
 
 94
 Butts at 148. It is this language in the Butts opinion upon which the majority hinges its argument.
 
 
 95
 Each of the three elected offices at issue in Butts was one to which only one person was elected from the voting district. Concluding that it is impossible to capture a "share" of a single-member office, the Second Circuit held that the contested electoral law did not trigger a vote dilution analysis and therefore could not violate Section 2(b).[4] The majority's decision in the instant case protracts Butts' reasoning to conclude that, where there are a number of identical positions to be elected from one geographic area, and each office holder exercises autonomy over that office, if minority groups are unable to elect their preferred candidate, this is simply a consequence of the political process and not the result of vote dilution.[5]
 
 
 96
 Despite prior interpretations of the Voting Rights Act that point to a congressional intent to give the Act the broadest possible scope in combatting racial discrimination in voting,[6] and despite our admonition in Chisom that application of Section 2 is not dependent on the function of the elected official involved, the majority expands Butts' rule beyond its logical bounds to an examination of a trial court judge's role as a sole decisionmaker.[7] Butts was decided in the context of an election for mayor, city council president and comptroller. In each of these elections, only one person would be elected to serve in each capacity; there would not, for example, be two comptrollers serving that geographic area. I cannot join in contorting the reasoning of Butts to a situation where several positions, albeit similar, are elected by and from the same voting body to serve the same geographic area.[8]
 
 
 97
 In concluding that Texas district court judges are single member office holders, the majority places significant reliance on its determination that the "full authority of a trial judge's office is exercised exclusively by one individual." Majority Opinion at 308. This conclusion seems contrary to the majority's summation of the judicial system in Texas. For example, administrative matters are handled through a collegial decision-making process by the district judges within the county. Such matters include the election of a local administrative judge, the appointment of staff and support personnel, the adoption of local rules of administration, the adoption of local rules and the exercise of supervisory authority over the clerk's office. See Tex.Govt.Code Ann. Sec. 74.091 et seq. (Vernon 1988). In addition, the judges are charged with the responsibility of appointing a county auditor. Id. Sec. 74.001 et seq. Looking to the county's caseload, the authority of resolving those controversies is shared by all. In Harris County, for example, fifty-nine district judges have overlapping authority to handle the heavy caseload of the district. Similarly, jury selection, case assignment, and record retention are handled on a county-wide basis. Furthermore, as the majority notes, "cases can be freely transferred between judges and ... any judge can work on any part of a case including preliminary matters." Majority Opinion at 304. One district judge may, therefore, find his or her hands tied--or greatly assisted--by an earlier order imposed by another court located in the county. Tex.R.Civ.Pro. 330(h). In light of this overlapping authority and responsibility, it seems somewhat incongruous to suggest that district court judges do in fact exercise "full" authority over the office.[9]
 
 
 98
 Regardless of the ultimate conclusion on that issue, an analysis of the asserted independent nature of Texas district court judges is not, in my view, the proper recipient of this Court's focus. Whether the office-holder wields his power in an individual or collegial manner is simply not the relevant inquiry. The single office-holder exception should not be construed so as to require an examination of whether each trial judge truly exercises his or her official duties independent of--or in conjunction with--the other judges. Rather, the single office exception is a common sense approach to the fact that an electoral scheme for election of only one official with unique responsibilities cannot be subdivided. Butts was not based on a "collegial decisionmaking" rationale, nor was this concept even discussed. The Butts exception is premised simply on the number of officials being elected and the impediment to subdividing a single position so that minority voters have the opportunity to elect a "share". Unlike the election for mayor or comptroller in Butts, the instant case is concerned with the election, within discrete geographic areas, of a number of officials with similar, and in most instances identical, functions.
 
 
 99
 One court has already specifically addressed the problem with which we are faced. In Southern Christian Leadership Conference v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989), the court rejected the application of Butts to the election of several trial judges from a single county.[10]
 
 
 100
 In effect, the at-large boundaries [in Butts] coincide with the only "district" boundaries possible; because there is only one position to be filled, it becomes impossible to split up the jurisdiction any smaller. The concept of vote dilution is effectively rendered meaningless and such offices are inappropriate for section 2 vote dilution challenges. There is no such rationale, however, for not applying section 2 to elected positions merely because "the full authority of that office is exercised exclusively by one individual," as the defendants would have this court do.
 
 
 101
 Siegelman at 519-20 (footnotes omitted).
 
 
 102
 The approach in Siegelman is consistent with the Supreme Court's analysis in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In Gingles, the Supreme Court stated that a threshold inquiry in a claim that an at-large election system dilutes minority voting strength is whether there is evidence that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. "The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected." Id. at 50 n. 17, 106 S.Ct. at 2766 n. 17. Proof of this geographically compact minority population essentially isolates the at-large electoral structure as the feature which has the potential to deny the minority fair electoral access. The maintenance of an at-large election scheme is not dilutive, however, where the electoral scheme in the relevant jurisdiction is not divisible because the office is held by only one person.[11]
 
 
 103
 Applying this reasoning, I would adopt the Siegelman court's definition of single member office:
 
 
 104
 The true hallmark of a single-member office is that only one position is being filled for an entire geographic area, and the jurisdiction can therefore be divided no smaller. While mayors and sheriffs do indeed "hold single-person offices in Alabama," they do so because there is only one such position for the entire geographic area in which they run for election.... [W]hat is important is how many positions there are in the voting jurisdiction. It is irrelevant, in ascertaining the potential existence of vote-dilution, that these officials happen to exercise the full authority of their offices alone.
 
 
 105
 Siegelman, 714 F.Supp. at 518 n. 19 (emphasis original).
 
 
 106
 The Voting Rights Act is violated where the challenged system has the effect of discouraging equal participation in the electoral process and of lessening the chance of minority voters to elect representatives of their choice. Where several officials, performing the same job, are elected at-large from one geographic area, the potential for vote dilution is no less tangible simply because each official acts independently of the others. As the court in Siegelman stated, I can "discern no rational reason why the concept of vote dilution cannot, or should not, apply to elected members of the judiciary simply because judges exercise their authority in solitude."[12] Id. at 520.
 
 
 107
 To focus primarily on the function of the official when analyzing a Voting Rights Act claim is to ignore the essential inquiry of the Act: has the fundamental right of minorities to vote for candidates of their choice been violated by the dilution of minority voting strength? A fair reading of Section 2 gives no indication that a reviewing court should concentrate on whether the election is for a mayor, an alderman, a legislator, a judge or any other kind of elected official.[13] Rather, the entire focus is on the minority voter and whether that voter has been allowed the opportunity to participate in the democratic process which has been designed to shape and mold our nation. As this Court stressed in Chisom,
 
 
 108
 [n]owhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official.... Once a post is open to the electorate, and if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.
 
 
 109
 Chisom at 1060 (citing Dillard, 831 F.2d 246).
 
 
 110
 The instant case reveals an electoral scheme which is "discriminatory but corrigible," through the use of subdistricts. Each county elects three to fifty-nine district court judges. In each county, all have the same authority and exercise the same responsibility. With the exception of specialty courts, all judgeships are essentially fungible; within each specialty, the judgeships are also clearly interchangeable. Section 2 requires that once correctable vote dilution has been established, it must be eradicated by the implementation of a plan which will "completely remedy"[14] the violation by "fully provid[ing an] equal opportunity for minority citizens to participate and to elect candidates of their choice." Senate Report Accompanying 1982 Amendments to Section 2, at 31.
 
 II.
 
 111
 In Gingles, the Supreme Court reaffirmed the totality of the circumstances approach to examining a vote dilution claim. This Court has set out guidelines for evaluating the totality of the circumstances in such a claim. In Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), this Court set forth a non-exclusive list of factors to be examined when applying the totality of the circumstances test. The factors, derived from the Senate Judiciary Committee Report accompanying the 1982 amendments to the Voting Rights Act, include (1) the history of discrimination in the state; (2) the extent to which voting is polarized by race; (3) the existence of practices or procedures which enhance the opportunity for discrimination; (4) whether minority groups have been denied access to a candidate slating process; (5) the existence and extent of any socio-political vestiges of discrimination; (6) whether political races are characterized by overt or covert racial appeals; and (7) the extent to which minority groups have been elected in the jurisdiction. In addition, the legislative history of the Act instructs that an inquiry into the responsiveness of the elected officials to minority needs and whether the state's asserted reasons for maintaining the existing system are tenuous may provide additional insight.
 
 
 112
 The Supreme Court in Gingles examined the totality of the circumstances to evaluate the North Carolina electoral scheme. In doing so, the Court noted that "[t]hese factors were derived from the analytical framework of White v. Regester ... as refined and developed by the lower courts, in particular by the Fifth Circuit in Zimmer...." Gingles 478 U.S. at 36 n. 4, 106 S.Ct. at 2759 n. 4 (citations omitted). The Supreme Court went further than the mere application of the totality test, however, and set forth a three-part foundation for proving a Section 2 vote dilution claim. The minority group must demonstrate first that it is sufficiently large and geographically compact to constitute a majority in a single-member district; second, that the minority is politically cohesive; and third, that the majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate. Gingles at 50-51, 106 S.Ct. at 2766-67. Unless these threshold factors are established, "the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice." Id. at 48, 106 S.Ct. at 2765. Once the plaintiffs have satisfied the threshold requirements, the district court proceeds to the totality of the circumstances inquiry.
 
 
 113
 The majority's holding that there cannot be a violation of Section 2(b) in the instant case extinguished the need to address the merits of the case.[15] However, without addressing the existence, vel non, of the threshold Gingles factors, the majority indicates it would nonetheless conclude that no Section 2 violation has been established because "the state's powerful interest in its structural arrangement of individual trial judges outweighs the potential amelioration of any dilution of minority interests achievable by districting." Majority Opinion at 308. A reading of the majority opinion provides no insight into whether the majority would consider the state's interest to be a threshold factor in parity with the Gingles factors, or whether the state's interest is more properly considered later during an overall examination of the totality of the circumstances. For the reasons stated below, I consider an examination of the State's interest to be a factor which should be weighed by a court applying the totality test only after existence of the threshold Gingles factors has been determined. I am further convinced that, whether treated as a threshold factor or in the context of the totality test, the state in the instant case has not articulated so compelling an interest in retaining the existing electoral scheme that the dilution of minority votes should go unremedied.[16]
 
 A.
 
 114
 The defendants argue that elections for trial judges present strong state interests for retaining an at-large election system. Even if this contention has merit, the State's asserted interests are relevant only to the inquiries of whether plaintiffs have proven a Section 2 violation under the totality of the circumstances and, if so, what remedy would be most appropriate to alleviate the dilution of minority voting strength, while intruding on state interests only to the extent necessary to accomplish the task.
 
 
 115
 By its own terms, Section 2 requires an assessment of the "totality of the circumstances" presented in the record. Courts applying the totality test are guided by Gingles' articulation of the relevant factors. When assessing the point at which a state's articulated interest in retaining the current at-large scheme should be considered, the Supreme Court's acknowledgment that the Senate factors are secondary considerations, behind the three-part Gingles test, is of particular relevance. Specifically, the Supreme Court noted that, while the Senate Report factors "may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the [three threshold factors], the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice." Gingles 478 U.S. at 48, 106 S.Ct. at 2765. From this language, it is apparent that the Supreme Court has articulated a legal test for vote dilution claims which anticipates a threshold showing of only geographical compactness, political cohesion, and white bloc voting.
 
 
 116
 The conclusion that the state's interest is properly considered in the second phase of the Gingles analysis is bolstered by the Senate Report's indication that the list "of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of Sec. 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." Gingles at 45, 106 S.Ct. at 2763 (footnote omitted). The Report stresses that no particular factors need be proved and neither the existence nor the non-existence of a majority of factors dictate the outcome. Rather, the determination of whether the political processes are equally open depends on an evaluation of the relevant political process. It is during this examination of the jurisdiction's political process that a state's interest in retaining the existing system is particularly relevant.[17]
 
 
 117
 Congress most certainly did not intend to frustrate the important state interest in a fair and impartial judiciary; at the same time, however, Congress explicitly expressed the affirmative intent to replace unlawfully dilutive electoral systems with ones in which minorities would have a full and fair opportunity to participate. In enacting Section 2(b) of the Voting Rights Act in 1982, it is clear that Congress was continuing the struggle to make the Act responsive to the needs and aspirations of the nation--to make absolutely certain that the fundamental right of minorities to vote for candidates of their choice was not abridged.
 
 
 118
 For these reasons, a court should first proceed to determine whether the Gingles three-part test has been met; it should then proceed to consider, under the "totality of the circumstances," other relevant factors,[18] including the state interest in maintaining an at-large election system, to determine whether, on balance, the plaintiffs have proved a Section 2 violation.[19]B.
 
 
 119
 In the instant case, the State has not emphasized the interests discussed above as justification for its dilutive electoral system. The State instead focused on the argument, already addressed, that Texas district court judges are single-person offices not subject to the dilution test. The State's interests which were asserted at trial include (1) ensuring popular accountability by making judges' jurisdiction coterminous with the electoral boundaries; (2) avoiding bias caused by small electoral districts; and (3) administrative advantages of at-large elections, including the use of specialized courts. The majority would accept the existence of these interests and afford them controlling weight:
 
 
 120
 In embracing the single official concept, we express the judgment that the state's powerful interest in its structural arrangement of individual trial judges outweighs the potential amelioration of any dilution of minority interests achievable by districting. This is particularly true here, where ... the subdistricting remedy is at best problematic, and is likely perverse. The state's interests include avoiding the fact and appearance of biased decisionmaking, preserving the core attribute of the trial judge--unshared and non-delegable judgment.
 
 
 121
 Majority Opinion at 308. I do not agree that the articulated state interest is sufficient to outweigh those factors demonstrating the existence of vote dilution.
 
 
 122
 Accountability: The State has advanced the argument that at-large elections provide greater accountability of the judge to county voters. Consequently, as the Chief Justice of the Texas Supreme Court testified, judges are "accountable to those people who can be hailed [sic] into their court," because people who feel they have been wronged by a particular judge may vote against that judge in the next election.
 
 
 123
 In the instant case accountability is not a compelling enough reason to justify maintaining the current dilutive system. The argument that judges must remain "accountable" to potential litigants in their courts pales in light of the current Texas venue rules, which frequently result in an out of county resident appearing before a judge for whom the litigant cast a vote neither for nor against. Similarly, parties can agree to give a county court venue over a case not arising in the county. Nipper v. U-Haul Co., 516 S.W.2d 467 (Tex.Civ.App.--Beaumont 1974).
 
 
 124
 There are other occasions when a party may appear before a judge elected by the residents of another county. For example, district court judges are frequently called into other counties to help with docket control. Despite the fact that the county's residents have no recourse against this out-of-county judge at the ballot box, Texas courts have upheld the constitutionality of this practice. See, e.g., Reed v. State, 500 S.W.2d 137 (Tex.Crim.App.1973). Nor is the practice of electing judges from subdistricts without precedent in the state. Texas Justice of the Peace courts, lower level trial courts, are elected from sub-county precincts while having jurisdiction over the entire county.[20]
 
 
 125
 Accountability may in fact provide one of the rationales for having an elected judiciary; in the instant case, however, the State has not explained why accountability is an important interest under the existing system. Judges will still be accountable to the electorate even if they are elected from areas smaller than the county. Furthermore, there is no indication that the theory of judicial accountability has worked in practice in the state. As witnesses for the defendants noted, judicial campaigns seldom addressed the judicial performance of the particular candidates. More commonly, voters cast their ballots on the basis of race, party affiliation, name recognition or other factors unrelated to judicial performance.
 
 
 126
 There seems to be no basis in fact for the State's contention that county-wide accountability is important to the proper selection of district judges, or that ensuring a measure of electoral accountability is significantly defeated by dividing the county into electoral districts. The State's asserted interest in assuring that litigants have the opportunity to respond at the ballot box to judges before whom they have appeared seems more academic than real.
 
 
 127
 A Fair and Impartial Judiciary: Both the State and intervenors put on witnesses who testified that the creation of subdistricts was inadvisable because it could lead to perceptions of judicial bias and undue influence by special interests. Specifically, the witnesses testified that judges elected from smaller districts would be more susceptible to undue influence by organized crime or to pressure by other political sources including special interest groups.
 
 
 128
 This concern that a judge elected from a small electorate is more susceptible to improper pressure, however, has not stopped Texas from creating judgeships in some counties with relatively small populations. Texas has 362 district courts. Of these, a significant number are elected from areas of less than 100,000 people; in a number of areas, as few as 24,000 to 50,000 people constitute the relevant electorate. Even if Harris County (with a population of 2.5 million people) was divided into fifty-nine subdistricts (the number of district courts of general and special jurisdiction), each district would contain approximately 41,000 people.[21] If Dallas County were divided into thirty-seven subdistricts, each subdistrict would have approximately 42,000 people. Consequently, the asserted State concern with the size of the electorate is of questionable import.
 
 
 129
 Furthermore, Texas law does not reflect the witnesses' fear that subcounty districts are inconsistent with the existence of a fair and impartial judiciary. Notably, the Texas Constitution does not even require the county-wide election of the district judges at issue here, but permits the voters to decide to elect them from subdistricts. See Tex. Const. Art. 5, Sec. 7a(i) (Vernon 1990). Justices of the Peace are already elected from areas smaller than a county; in a very extended number of counties, these districts contain smaller populations than the hypothetical subdistricts of Dallas and Harris counties discussed above. For example, the Texas Constitution permits counties with as few as 18,000 people to be divided into four justice of the peace precincts. Tex. Const. Art. 5, Sec. 18(a) (Vernon 1990).
 
 
 130
 Considering the precedent within the state for the creation of judicial subdistricts, the size of the potential subdistricts, and the lack of any real indication that perceived impropriety would result,[22] I cannot agree that this asserted interest should be afforded substantial weight.
 
 
 131
 Administrative Advantages: The State has cited to the administrative advantages of the present system, including the county-wide retention of records, the random assignment of cases to judges within the county which aids docket control and county-wide jury empaneling. There is no reason why an electoral scheme utilizing subdistricts cannot retain each and all of these administrative features; any remedy imposed in this case need not require that a judge elected from a subcounty area have jurisdiction only over that area. In fact, the interim plan fashioned by the district court specifically retained these administrative features. Furthermore, even if retention of certain administrative conveniences were not possible under a remedial scheme, that fact cannot justify the continuation of an otherwise racially dilutive electoral process. See Westwego Citizens for Better Gov't v. Westwego, 872 F.2d 1201 (5th Cir.1989).
 
 
 132
 The majority opinion seems to place great weight on the interest of the State in retaining the system of "specialty" courts. I am unable to conceive why a remedy would be unable to accommodate this interest in retaining these courts of specialized jurisdiction.[23] Most counties which utilize the administrative convenience of specialty courts have several of each court; consequently, a remedy can be formulated which retains the use of such courts.[24] It cannot be gainsaid that the State has almost unlimited flexibility to devise a remedial plan which retains specialty courts and other important government interests as much as possible while eradicating the dilution of minority voting strength. It is my firm belief that the history, the intent, the text and spirit of the Voting Rights Act in general and Section 2 in particular mandates the implementation of just such a remedial electoral scheme.
 
 
 133
 Summary: Taken together, the State's articulation of its interest in retaining the current system seems impotent when compared to the clear purpose of the Voting Rights Act. The State has not shown an inalterable policy of not subdividing districts, nor has it shown that judges will be less accountable to the electorate when elected from a smaller unit. Further, there is no indication that any impropriety, real or perceived, on the part of judges elected from smaller units will in fact occur; this is especially true in light of the size of some electoral units already in existence. Finally, while the State may indeed have a legitimate interest in retaining specialty courts, the State has failed to demonstrate why that interest cannot be effectuated in an electoral scheme which does not dilute minority voting strength. While it may indeed be possible that a case will someday come before a court in which a state can articulate such an interest in retaining the current system so as to tip the balance when weighing the totality of the circumstances, I am convinced that this is not that case.
 
 III.
 
 134
 Although there is not room to fully address the district court's opinion on the merits, I feel it is necessary to indicate that I would not affirm the remedial portion of the district court's order in toto. Specifically, I am constrained to conclude that the district court acted beyond the scope of its remedial powers by ordering that judicial elections be nonpartisan.
 
 
 135
 A district court, in fashioning a remedy under the Voting Rights Act or the Constitution, must not reject state policy choices any more than necessary to correct the specific violation involved. See White v. Weiser, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Interim plans are not exempt from the requirement of due deference to state policy. In fact, because reapportionment is primarily a matter for legislative consideration,[25] the doctrine of judicial deference to state interests is especially strong when a court orders a temporary or interim plan. Upham v. Seamon, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). As this Court stated in Chisom v. Roemer, 853 F.2d 1186, 1189 (5th Cir.), rehearing denied, 857 F.2d 1473 (1988):
 
 
 136
 a federal court should jealously guard and sparingly use its awesome power to ignore or brush aside long-standing state constitutional provisions, statutes, and practices. There can be no doubt that ... federal courts do and indeed must have this authority in our unique form of government. It is the use of this power that must be maintained in the balance, a balance which is more delicate than usual when a state's judicial process is involved.
 
 
 137
 The district court's order fails to defer to a political choice of the State of Texas, a choice which was not even challenged by the plaintiffs in the instant case. The district court gave no explanation for rejecting the system of partisan elections. No evidentiary hearing was held on the issue, and no factual findings were made. The equity powers of the district court neither encompass nor justify the district court's actions; the district court should have deferred to the state's policy choice for partisan elections as expressed in its statutory scheme.
 
 IV.
 
 138
 In sum, I cannot concur in the majority's opinion in the instant case. "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century."[26] I stand strong in the belief that the majority has chosen the wrong lens with which to examine this particular specimen of vote dilution. The majority has looked to the function of the elected official, and the duties and powers of that official once in office, to conclude that, because trial judges act independently, at-large elections cannot result in minority vote dilution. Again, there is no support in the words of the Act itself, in Chisom, in the legislative history of Section 2, nor in logic for the majority's embrace of this result-oriented distinction; neither the language nor the history of the Voting Rights Act indicates that the Act is, in any way, concerned with what names or positions are listed on the ballot. Section 2(b) of the Voting Rights Act is concerned with the rights of the minority voters casting their ballots for leaders of their choice. The United States Congress, by enacting the Voting Rights Act, has instructed that this and every other court focus on the power and effect of each vote cast, and in making sure that, because of submergence in white majority areas, minorities are not denied an equal opportunity to effectively participate in the democratic process.
 
 
 139
 I respectfully dissent.
 
 
 
 *
 See 902 F.2d 322
 
 
 [1]
 Ten counties actually are targeted. The challenged 72nd Judicial District encompasses two counties, Lubbock and Crosby. We will refer to the nine targeted Judicial Districts as nine counties
 
 
 [2]
 In White v. Regester the Supreme Court interpreted the requirements of the Voting Rights Act and the U.S. Constitution with respect to claims of vote dilution:
 The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question--that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.
 412 U.S. at 766, 93 S.Ct. at 2339.
 
 
 [3]
 The Fifth Circuit found the vote dilution claim in Mobile v. Bolden to be problematic, since no successful dilution claim expressly grounded on section 2 had been made previously. 571 F.2d 238, 243 (5th Cir.1978). This weakens claims that the new section 2 was merely returning to pre-Bolden standards
 
 
 [4]
 The one-person, one-vote principle mandated by the equal protection clause of the Fourteenth Amendment was held not to apply to the apportionment of state judiciaries in Wells v. Edwards, 347 F.Supp. 453 (M.D.La.1972) (3-judge court), aff'd mem., 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) (three justices, dissenting). Wells was distinguished from cases challenging election practices in Lefkovits v. State Board of Elections, 400 F.Supp. 1005 (N.D.Ill.1975) (3-judge court), aff'd mem., 424 U.S. 901, 96 S.Ct. 1092, 47 L.Ed.2d 306 (1976), where the court stated:
 [W]hen a judge is to be elected or retained, regardless of the scheme of apportionment, the equal protection clause requires that every qualified elector be given an equal opportunity to vote and have his vote counted.
 Id. at 1012. This was the precise point made by Solicitor General Fried in his successful argument to the Supreme Court that it should summarily affirm Haith v. Martin.
 
 
 [5]
 The changes required to be precleared in Haith had to do with the elections of trial judges. The district court did not reach the merits of any vote dilution claims, for it had no jurisdiction to do so. New voting practices must be submitted to either the Attorney General or the D.C. Circuit for preclearance. Other district courts only have jurisdiction to decide whether a practice is a change requiring preclearance. Consequently, the merits of a vote dilution claim with respect to trial judges was not before the Supreme Court
 
 
 [6]
 Some see Section 5 as being the most intrusive aspect of the Voting Rights Act:
 This so-called "preclearance" requirement is one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a "substantial departure ... from ordinary concepts of our federal system"; its encroachment on state sovereignty is significant and undeniable. The section must, therefore, be read and interpreted with care.
 United States v. Sheffield Board of Comm'rs, 435 U.S. 110, 141, 98 S.Ct. 965, 984, 55 L.Ed.2d 148 (1978) (Stevens, J., dissenting) (footnote omitted). See also Katzenbach, 383 U.S. at 358-62, 86 S.Ct. at 833-35 (Black, J., dissenting).
 
 
 [7]
 The only time a district has been drawn smaller than a county was when the legislature divided both Dallas and Bexar Counties into two districts, each district having jurisdiction throughout the whole county. The judge for each district was elected by the voters in the district in accordance with the constitution's command, Tex. Const. art. V, Sec. 7 (1876, amended 1985), as opposed to being elected by county-wide vote as now. Thus, there is some precedent for dividing counties into geographically distinct districts. The statutes dividing Bexar and Dallas Counties into two districts were repealed in 1895 and 1907, respectively
 
 
 [8]
 The presiding administrative judge's duties are to:
 (1) ensure the promulgation of regional rules of administration within policies and guidelines set by the supreme court;
 (2) advise local judges on case flow management and auxiliary court services;
 (3) recommend to the chief justice of the supreme court any needs for judicial assignments from outside the region;
 (4) recommend to the supreme court any changes in the organization, jurisdiction, operation, or procedures of the region necessary or desirable for the improvement of the administration of justice;
 (5) act for a local administrative judge when the local administrative judge does not perform the duties required by Subchapter D;
 (6) implement and execute any rules adopted by the supreme court under this chapter;
 (7) provide the supreme court or the office of court administration statistical information requested; and
 (8) perform the duties assigned by the chief justice of the supreme court.
 Tex.Gov't Code Sec. 74.046 (Vernon 1988) (footnote omitted); see also Judicial Administration Rule 5 (Vernon 1988). The presiding administrative judge is authorized to perform the acts necessary to "improve the management of the court system and the administration of justice." Tex.Gov't Code Sec. 74.047 (Vernon 1988).
 
 
 [9]
 In Haith v. Martin, 618 F.Supp. 410 (D.C.N.C.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986), the district court referred to the superior court judges in North Carolina, also trial judges, as "designated seats in multi-member districts." Id. at 414. The issue there was not a violation of section 2, however, but whether section 5 of the Act applied to such judicial elections, requiring preclearance of changes
 
 
 [10]
 Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547 (11th Cir.1987), cert. denied sub nom. Duncan v. Carrollton, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), is not to the contrary. The court there faced a single commissioner county government. It found that whether the change from a multi-member to a single commissioner in 1951 was the product of an illicit racial legislative purpose presented a fact question for trial. There is no finding here that the methods of electing judges in Texas were adopted or maintained for a racist purpose. The impermissible purpose, if established, constituted the violation of Sec. 2. The plaintiffs have a right under the section to have such acts voided. That the remedy for the intentional discrimination might be to create a multi-member board to replace the single official does not compel a conclusion that the court believed the plaintiffs had a right to a "share" of the single position in the absence of the impermissible intent
 
 
 [11]
 Moreover, cases without minority parties, but nonetheless concerning issues important to minority groups, would have an 84.75% chance of being assigned to a judge with no accountability to minorities living in the county
 
 
 [1]
 Louisiana Supreme Court Justices sit as members of a collegial body
 
 
 [2]
 The United States Attorneys General have consistently interpreted the Voting Rights Act broadly, and, more recently, the Attorney General has interpreted Section 2 to reach elected judges. At the time the original Voting Rights Act was passed in 1965, the Attorney General stated that "every election in which registered voters are permitted to vote would be covered." Voting Rights: Hearing Before Subcommittee No. 5 of the House Judiciary Committee, 89th Cong. 1st Sess. 21 (1965) (emphasis added). In both Chisom and in the instant case, the Attorney General filed an amicus brief in which he maintains that the scope of Section 2 reaches all elections, including judicial elections
 Additionally, in a very recent Section 5 preclearance review of the majority vote, designated post, at-large method of electing judges in Georgia, the Assistant Attorney General has denied preclearance, concluding, in part:
 Our review of a broad range of evidence in this regard indicates that polarized voting generally prevails in all of the superior court circuits now under review and there is a consistent lack of minority electoral success in at-large elections. Thus, it appears that, in the totality of the circumstances, black voters in these circuits have a limited opportunity to elect their preferred candidates....
 In addition, the state has not shown how its interests are served by circuitwide elections in many of the circuits now at issue where the at-large election feature is in apparent violation of Section 2 of the Voting Rights Act.
 Letter from Assistant Attorney General John R. Dunne to Georgia Attorney General Michael J. Bowers (Apr. 25, 1990).
 
 
 [3]
 The majority begins its erosion of Chisom by altering the focus of that opinion's construction of the term "representative," which is found in the statutory language of Section 2(b). 42 U.S.C. Sec. 1973(b). In Chisom, we defined a representative, for purposes of the Voting Rights Act, as anyone selected by popular election from a field of candidates to fill an office. 839 F.2d at 1063. The majority now subtly constricts this definition by redefining "representative" as someone who "reflect[s] the views of the electors," Majority Opinion at 299, and "who is responsive to [the peoples'] changing will." Id. at 296. This amended construction of the statutory term incorrectly focuses on the role played by a judge after he or she has been elected, and is necessary for the majority's "single official" argument, which is based on an examination of the duties and functions performed by a trial judge once he or she is in office. The express language of Section 2(b) looks only to the "political processes leading to nomination or election," and to whether minority members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Congress intended in Section 2 to focus on the elimination of discrimination in voting, thus the title of the Act, and on allowing minorities opportunities for electoral success. See Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); Haith v. Martin, 618 F.Supp. 410, 413 (E.D.N.C.1985), aff'd, 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986) (the Act applies "to all voting without any limitation as to who, or what, is the object of the vote") (emphasis in original). As one court has emphatically noted, [n]owhere in the 239 pages of the [Senate] Report is there any indication whatsoever that Congress intended the Voting Rights Act to apply to only particular types of elections. Rather, the entire Report indicates ... that the 1982 amendment was intended to effect an expansive application of the Act to state and local elections
 Southern Christian Leadership Conference v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989).
 The title or duties of an elected office, and what transpires in the office after the votes are cast and counted are of little consequence to the fundamental question of whether, due to significant white bloc voting, the votes of a cohesive minority group are consistently submerged and rendered ineffectual to elect the minority's preferred candidate.
 
 
 [4]
 The Butts rule that a single-member office is not physically divisible has even been implicitly rejected in Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547 (11th Cir.1987). In Stallings, plaintiffs challenged the one-person form of county commission government in Carroll County, Georgia, because it diluted minority voting strength and lessened the opportunity of black persons in the county to participate in the electoral process. This one-person system had been in effect since 1953. The Eleventh Circuit reversed a judgment in favor of the defendants, holding that the district court had applied the incorrect legal standard (in light of Gingles) by failing to give the proper weight to the two most important factors in a Section 2 vote dilution claim: (1) the extent to which minorities had been elected, and (2) the existence of racially polarized voting. Id. at 1555
 In its brief discussion of Stallings, the majority mischaracterizes the Eleventh Circuit's analysis, implying that the reversal turned only on the presence of evidence indicating a discriminatory intent. In fact, the Eleventh Circuit devoted most of its discussion to an analysis of the "effects" test of Section 2 and Gingles, and to the district court's findings as to whether the single-member scheme resulted in discriminatory vote dilution. The Eleventh Circuit reversed the district court's judgment based both on its treatment of the plaintiffs' constitutional challenge, and on its treatment of the Section 2 challenge as well.
 
 
 [5]
 The court in Butts noted that
 [t]he district court appears to have implicitly assumed ... that the Act condemns any electoral arrangement that makes it more difficult for a minority class to elect one of its members to office. That is not the standard for determining violations of the Act.... [T]he Act is concerned with the dilution of minority participation and not the difficulty of minority victory.
 Butts at 149.
 
 
 [6]
 See, e.g., Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); Chisom, 839 F.2d at 1059
 
 
 [7]
 The majority's reliance on Dillard v. Crenshaw County, 831 F.2d 246 (11th Cir.1987), is misplaced. The majority cites this case as an example of a court analyzing the functions performed by an official to determine if the position is a single-member office. The issue in Dillard, however, was not the threshold question of whether Section 2 applied to the office under consideration, but, rather, whether a proposed Section 2 remedy was adequate
 
 
 [8]
 In its brief to this Court, the State notes that the reasoning of Butts has been extended to judicial elections. United States v. Dallas County Commission, 850 F.2d 1430 (11th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). In Dallas County Comm'n, the Eleventh Circuit held that the at-large election of the probate judge position in question was permissible under the Voting Rights Act. While the cited case bolsters the proposition that the Voting Rights Act does apply to the judiciary, it does not aid the defendants in arguing that the reasoning of Butts should be applied to the situation in the instant case. Unlike the situation currently before us, in which there are a number of judgeships in the relevant area, the Eleventh Circuit was reviewing an electoral scheme in which only one probate judge was to be elected from the relevant geographic area
 
 
 [9]
 Straining to encompass Texas trial judges within the Butts exception the majority focuses on cases after they have been assigned to an individual judge, and concludes that each judge decides each case individually without input from other district judges. This factor, concludes the majority, classifies a trial judge as a "single-member" office holder, thus rendering a vote dilution claim completely inapplicable to the at-large election of these officials
 The majority is not even consistent in its argument. In the opinion's penultimate paragraph, for example, the majority admits that an "amelioration of ... dilution of minority interests" might be possible by redistricting. Majority Opinion at 308. The majority concludes, however, that this potential improvement is outweighed by state interests in maintaining an at-large scheme. The majority also suggests that other voting structures, such as majority vote requirements, anti-single shot voting provisions, or numbered posts might be challenged and adjusted. Obviously, voting structures such as numbered posts do not logically apply to a single office position. Where significant racial polarization of voting exists, these structures operate in conjunction with at-large multi-seat elections to dilute minority votes.
 
 
 [10]
 The Siegelman court concluded, and I agree, that the courts in both Butts and Dallas County Comm'n implicitly utilized the term "single-member office" to refer "to a situation where under no circumstances will there ever be more than one such position in a particular geographic voting area." Siegelman at 518
 
 
 [11]
 The approach set forth in this dissent is not novel. As the majority concedes, several courts have found Section 2 violations in cases arising from similar factual situations. For example, in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), the district court assumed that districts with more than one judicial position were properly characterized as multi-member districts. Similarly, in Haith v. Martin, the district court concluded that because North Carolina Superior Court judgeships are "designated seats in multi-member districts, ... they are subject to section 5 preclearance requirements." 618 F.Supp. 410. Quoting the language of Section 2, the Haith court stated that "the Act applies to all voting without any limitation as to who, or what, is the object of the vote." Id. at 413. See also Martin v. Allain, 658 F.Supp. 1183 (S.D.Miss.1987); Williams v. State Board of Elections, 696 F.Supp. 1563 (N.D.Ill.1988). The majority, noting that Haith's focus was preclearance under Section 5 and not the merits of a vote dilution claim under Section 2, discounts this reference to the designation of trial judges as part of a multi-member body
 While urging that Haith is irrelevant to the instant case because it involves Section 5 preclearance, the majority notes that there is no reason to distinguish between Section 5 and Section 2 with "respect to their applicability to judicial elections." Majority Opinion at 302. The majority's conclusion is based on the realization that [t]o hold otherwise would lead to the incongruous result that if a jurisdiction had a discriminatory voting procedure in place with respect to judicial elections it could not be challenged, but if the state sought to introduce that very procedure as a change from existing procedures, it would be subject to Section 5 preclearance and could not be implemented.
 Id. Yet even as the majority acknowledges the interlocking nature of Section 2 and Section 5, it exempts from its reasoning those judges who do not act collegially. The majority is attempting to maneuver a judicial tightrope; I find the majority's approach strained, at best, and at worst internally inconsistent. I am unable to concur in this reasoning.
 
 
 [12]
 The majority asserts that the essential right secured to minorities under Section 2 is the right to have "their interests ... represented in governmental decisions." Majority Opinion at 308. The majority states that the goal of electing minority judges is "so that minorities' views and concerns are considered by the judges who decide important issues in their lives." Id. at 307
 By characterizing the goal of Section 2 in this fashion, the majority opinion lays the foundation for its argument that subdistricting multi-seat counties would create a perverse result by lessening "minority influence" over the decisions reached in lawsuits. The majority is concerned that under a system such as that set out in the district court's interim plan, there is a high probability that a minority voter appearing in court will have his or her case heard by a judge which he or she had no hand in electing. Majority Opinion at 312-313. The majority notes that under the district court's interim plan, for example, a minority litigant has "a 98.3% chance of appearing before a judge in whose election he had not been able to vote." Id. at 313. These statistics are meaningful, however, only if one accepts the unstated premise that Texas district judges decide cases according to the way their constituency would like them to decide, rather than according to what the law requires. If this were the case, then it should be noted that even under the existing system it is highly probable that a case will be heard outside the county in which a voter lives. In such a case, at least one--and probably both--of the parties will be appearing before a judge who was elected by a population which does not include that party.
 The majority's discussion approaches the problem from the wrong direction; quite simply, the focus should be on the rights of the voter, not the litigant. The essential inquiry is whether the minority vote is being diluted--whether minority citizens have an equal chance of electing candidates of their choice. As the majority acknowledges, the standard is whether the political processes are equally open to participation. The focus of both the 1982 legislative history of the Act and Gingles is on electoral opportunities and success.
 It is true that one of the Senate Report factors that may be probative in a vote dilution case to establish a Section 2(b) violation is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S.Rep. at 29. However, the Senate Report emphasizes that "[u]nresponsiveness is not an essential part of plaintiff's case." Id. at n. 116. In fact, in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), a case involving a vote dilution challenge to the use of multi-member districts and at-large voting to elect Louisiana district court, family court, and court of appeals judges, the district court remarked that the element of responsive representation simply is not a consideration in a judicial election case:
 The Senate Report ... also suggested that lack of responsiveness on the part of elected officials to the particularized need of the members of the minority group might be a factor in some cases.... That obviously is not a factor in this case since the only response which a member of the judiciary may make is to rule on all matters fairly and impartially, without favoring or being prejudiced against any group.
 Id. at 301.
 The right of minorities to an equal opportunity to elect the candidates of their choice, presumably minority candidates, encompasses more far-reaching effects than the ability to take part in the decisionmaking processes of self-government. Despite the progress achieved under federal and state civil rights statutes, minorities in this country are not yet free of the lingering legacy of racial discrimination in areas such as employment and education. Black and Hispanic judges serve as role models for other minority group members, who may not have envisioned a legal or judicial career as any sort of a real possibility in the past. In addition, minority electoral victories encourage other minority members to participate in the political process by voting and by running for office. Persistent minority defeat, on the other hand, leads to voter apathy and a feeling of exclusion from the opportunity to join in the process of self-government.
 
 
 [13]
 Section 2, as amended in 1982, now provides:
 (a) No voting qualification or prerequisite to voting or standard practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 (b) A violation of subsection (a) established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. Sec. 1973.
 
 
 [14]
 Dillard, 831 F.2d at 252
 
 
 [15]
 In holding that the current at-large scheme for electing Texas district court judges violates Section 2, the district court made various factual findings regarding the Gingles threshold factors as well as the Senate Report, or Zimmer, factors. It is noted that the majority never reaches the district court's treatment of the vote dilution factors, however, based on its per se exclusion of at-large elections for trial judges from the scope of Section 2(b). For purposes of this dissent, I need not now decide if the district court correctly determined these factual issues. I do note, however, that the trial record is replete with evidence of an inescapable reality: minorities in the challenged Texas districts are seldom ever able to elect minority candidates to any of the at-large district court judge positions available in the districts
 
 
 [16]
 I express no opinion as to whether or not such a situation may ever be demonstrated
 
 
 [17]
 When weighing a state's claim that it has a compelling interest in retaining the existing at-large system, courts should keep in mind the common sense notion that the role of judges differs from that of legislative and executive officials. Since it is not the role of judges to "represent" their constituents, an examination of the "responsiveness" of the elected official to minority concerns is clearly irrelevant. The Senate Report has specifically indicated that unresponsiveness is not an essential part of a plaintiff's claim. S.Rep. at 29, n. 119
 Alternatively, a state may be able to demonstrate that the continued use of an at-large district insures a fair and impartial judiciary because judges are elected from all of the people. The state may conclude that judges should be discouraged from thinking of themselves as representing the interests of a particular jurisdiction. While the interests of fairness and impartiality exist at all levels of the state judicial system, their weight lessens as they are applied to lower courts. Once a state decides to elect judges from areas smaller than the entire state, it has made a decision to permit the appearance that lower court judges are accountable to only part of the electorate. Consequently, closer scrutiny may be given to the state's choice of an electoral scheme.
 
 
 [18]
 For example, one of the two "[a]dditional factors that in some cases have had probative value" in the Senate Report's illustrative list of totality of the circumstances factors is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S.Rep. No. 417, 97th Cong., 2d Sess. 29, reprinted in 1982 U.S.Code Cong. & Admin. News 177, 207. In the proceedings below, the district court considered this factor at the appropriate point--during a trial on the merits. The district court was not persuaded by defendants' defense that at-large elections served a critical state interest. The court determined that "[w]hile the Court does not find that the present system is maintained on a tenuous basis as a pretext for discrimination, the Court is not persuaded that the reasons offered for its continuation are compelling." District Court Opinion at 77
 
 
 [19]
 Because of my view that the State has not articulated a substantial interest in retaining the existing at-large system of electing district judges, I do not address the question of how much weight this factor should be afforded. As the Supreme Court has indicated, "recognizing that some Senate Report factors are more important to multimember district vote dilution claims than others ... effectuates the intent of Congress." Gingles, 478 U.S. at 49 n. 15, 106 S.Ct. at 2765 n. 15. I do, however, indicate my firm belief that, under no circumstances, should the State's interest outweigh the following factors: the extent to which minority group members have been elected to office in the jurisdiction and the extent to which voting in the elections of the jurisdiction has been racially polarized. This belief is based on my acknowledgement of the Supreme Court's indication that "[u]nder a 'functional' view of the political process mandated by Sec. 2 ... the most important Senate Report factors bearing on Sec. 2 challenges to multimember districts are [these factors.]" Id. Additionally, placing greater weight on the factors which examine minority success at the polls and racial voting patterns furthers the purpose of the Act to "correct an active history of discrimination ... [and] deal with the accumulation of discrimination." S.Rep. at 5
 
 
 [20]
 In Martin v. Allain, 658 F.Supp. 1183, 1195-96 (S.D.Miss.1987), the court adopted a single-member district remedy for some Mississippi trial judges who were elected at-large in racially dilutive elections, after finding that Mississippi already elected some other judges from areas smaller than the court's jurisdiction. The court there stated:
 Although the state has adopted the policy of the post system of electing judges in multi-member judicial districts above the justice court level, it long ago adopted the policy of single-member electoral districts for justice court judges. The state also has the policy of judges deciding cases which may originate outside their election districts.
 
 
 [21]
 This is not meant to suggest, however, that this many subdistricts are required. If fewer subdistricts are utilized, each subdistrict will, of course, have a greater population
 
 
 [22]
 It is also notable that one judge, an intervenor in the instant case, testified that he was not aware of any allegations of unfairness or suggestions that white litigants were not treated fairly by minority judges elected from subcounty Justice of the Peace precincts
 
 
 [23]
 It should be noted that the Texas Constitution limits the State's interest in establishing specialty courts; the state supreme court has ruled that the legislature may not disturb state courts' jurisdiction
 
 
 [24]
 Because the district court, in its interim plan, indicated the belief that a remedy could be created which allows the substantial use of the Texas system of specialty courts, District Court Order at 7, I express no view on whether or not a state's interest would be substantially stronger if such a remedy could not be devised
 
 
 [25]
 Connor v. Finch, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977)
 
 
 [26]
 South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966)